UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
ZACHARY LEWY, JOHN LEE,
ERIC KLEMENT and BENJAMIN L. PADNOS,
individually and on behalf of all others similarly
situated,

                        Plaintiffs,

       -against-

SKYPEOPLE FRUIT JUICE, INC., RODMAN &
RENSHAW, LLC, YONGKE XUE,
HONGKE XUE, XIAOQIN YAN, SPRING LIU,
NORMAN KO, GUOLIN WANG,
ROBERT B. FIELDS and
JOHN SMAGULA,

                        Defendants.
--------------------------------------------------------x

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _9-10-12_

11 Civ. 2700 (PKC)

MEMORANDUM
AND ORDER

## CONTENTS

BACKGROUND ................................................................................................. 2

I.     Parties.......................................................................................................... 2

II.    Documents Allegedly Containing False Statements (the "U.S. filings") ............................. 5

III.   Allegedly False Statements....................................................................................... 6

    a.   Non-reporting of Yingkou Transaction ................................................................. 6

    b.   Alleged Misstatement of FY 2009 Financial Figures ............................................. 7

    c.   Alleged Misstatement of FY 2008 Financial Figures ........................................... 11

DISCUSSION ..................................................................................................... 12

I.     Legal Standard .......................................................................................... 12

    a.   Rule 8 ................................................................................................. 12

    b.   Rule 9(b) and the PSLRA ................................................................... 13

    c.   *Rombach* Does Not Require Application of Rule 9(b) to the Securities Act Claims. ....... 14

II.    Securities Act Claims ................................................................................. 17

    a.   Sections 11 and 12 ............................................................................. 17

    b.   Section 15.......................................................................................... 21

III.   Exchange Act Claims................................................................................. 22

a.   Section 10(b) .......................................................................................... 22

1.   Plaintiffs Sufficiently Allege a Section 10(b) Claim Based on the Filing of False Financial Statements for FY 2009. .................................................... 23

2.   Plaintiffs Fail to Sufficiently Allege a Section 10(b) Claim  Based on the Financial Statements for FY 2008. .................................................... 31

3.   Plaintiffs Fail to Sufficiently Allege a 10(b) Claim Based on the Yingkou Transaction.............................................................................................. 32

b.   Section 20(a) .......................................................................................... 38

**CONCLUSION** ...................................................................... 40

P. KEVIN CASTEL, District Judge:

This is a putative class action for violation of federal securities laws.  Defendants are, variously, a Florida corporation, several of its officers and directors, its controlling shareholder, and the underwriter of certain securities offered by the company.  Plaintiffs are individuals who purchased shares in the defendant corporation either as part of a secondary offering or in the open market.  Plaintiffs allege that defendants failed to disclose a related-party transaction and misstated various financial figures in their required reporting, and that plaintiffs relied on those omissions and misstatements and lost money as a result.  The corporation, together with one of its officers and certain directors, now moves to dismiss plaintiffs' complaint for failure to state a claim upon which relief can be granted.  The underwriter moves to dismiss certain claims insofar as they are alleged by plaintiffs who, the underwriter asserts, lack standing. For reasons explained, the underwriter's motion is granted, and the corporation's motion is granted in part and denied in part.

## **BACKGROUND**

I.     Parties

Defendant SkyPeople Fruit Juice, Inc. ("SPU") is a Florida corporation with its

principal executive offices in Xi'an, China.  (Consolidated Amended Class Action Complaint ("CAC") ¶ 61).  SPU "purports to produce and sell fruit juice concentrates, fruit beverages, and other fruit-related products in and from [China]."  (Id. ¶ 6.)

SPU claims to have the following business structure (see diagram):  SPU is the 100% owner of Pacific Industry Holding Group ("Pacific"), a Vanuatu corporation.  (Id. ¶ 101.) Pacific owns 99.78% of SkyPeople Juice Group Co., Ltd ("SkyPeople China"), a Chinese corporation.  (Id.)  SkyPeople China owns 91% of Qiyiwangguo Modern Organic Agriculture Co., Ltd. ("Qiyiwangguo"), 100% of Huludao Wonder Fruit, Co., Ltd. ("Huludao"), and 100% of Yingkou Trusty Fruit Co., Ltd. ("Yingkou").  (Id.)  Qiyiwangguo, Huludao, and Yingkou are Chinese corporations (id.) and represent three different production facilities for SPU's products (see Marder Decl., Dec, 21, 2011, Ex. F, Absaroka Capital Mgmt., Initiating Coverage Report: SkyPeople Fruit Juice, Inc., - Pulp Fiction (June 1, 2011) (the "Absaroka Report"), at 7-12.)



Defendant Rodman & Renshaw, LLC ("Rodman") is a broker-dealer who served as the underwriter and sole manager of the secondary public offering of $25.9 million of SPU stock that was completed on or about August 30, 2010.  (Id. ¶ 74.)

Defendant Yongke Xue ("CEO Xue") was at all relevant times Chief Executive Officer and a director of SPU.  (Id. ¶ 62.)  Defendant Spring Liu ("CFO Liu") was, until her resignation on September 21, 2011, Chief Financial Officer and a director of SPU.  (Id. ¶ 63.) Defendant Xiaoqin Yan (VP Yan) was at all relevant times a vice-president and director of SPU. (Id. ¶ 64.)  Collectively, CFO Xue, CFO Liu, and VP Yan are the "Officer Defendants."

Defendants Ko, Wang, Fields, and Smagula were at relevant times directors of SPU and members of its audit committee.  (Id.  ¶¶ 67-70.)  Members of the audit committee are allegedly responsible for, among other things, "assisting the Board of Directors in fulfilling its responsibilities, by reviewing (i) the financial reports provided by [SPU] to the SEC, the Company's stockholders, or to the general public, and (ii) [SPU's] internal financing and controls," and "overseeing [SPU's] compliance with legal and regulatory requirements."  (Id. ¶ 77.)  Ko, Wang, and Fields were on the audit committee at the time that SPU made its 2009 SEC filings; Ko, Wang, and Smagula were on the audit committee at the time that SPU filed the registration statement for the secondary offering.  (Id. ¶¶ 78-79.)  Collectively, Ko, Wang, Fields, and Smagula are the "Director Defendants."

Defendant Hongke Xue ("H. Xue") was at all relevant times a controlling shareholder of SPU, holding roughly 59% of SPU's stock as of the date of the secondary offering and roughly 45% as of March 25, 2011.  (Id. ¶ 66.)  H. Xue was also at all relevant times CEO and Chair of the Board of SkyPeople China.  (Id.)  H. Xue is the brother of CEO Xue.  (Id.)

Plaintiff Padnos purchased 4500 shares of SPU stock directly from Rodman at the secondary offering price of $5.00.  (Id. ¶ 60.)  Padnos sold 4400 shares on June 1, 2011, at a price of $2.10, and made no other transactions in SPU securities.  (Id.)  Plaintiffs Lewy, Lee, and Klement allegedly "purchased shares of [SPU] at artificially inflated prices and [were] damaged

thereby."  (Id. ¶¶ 57-59.)

        II.      <u>Documents Allegedly Containing False Statements (the "U.S. filings")</u>

Plaintiffs allege that defendants made the allegedly false statements described below in SPU's SEC Form 10-K for fiscal year 2009, <u>see</u> SkyPeople Fruit Juice, Inc., <u>SEC Form 10-K for Year Ended Dec. 31, 2009</u>[1] (the "2009 Form 10-K").  (CAC ¶¶ 258.i, 260.)  SPU's 2009 Form 10-K was signed and certified pursuant to the Sarbanes-Oxley Act by CEO Xue and CFO Liu; it was also signed by VP Yan and Directors Wang, Fields, and Ko.  (CAC ¶ 258.i.)  Plaintiffs allege that defendants repeated at least some of the false statements in all of the following documents (collectively, with the 2009 Form 10-K, the "U.S. filings"):

- Quarterly reports for the first, second, and third quarters of FY 2010 on SEC Forms 10-Q filed May 17, 2010, August 16, 2010, and November 15, 2010, which forms were signed by CFO Liu and certified by Liu and CEO Xue.

- A proxy statement issued on June 28, 2010.

- A registration statement and amendments thereto culminating in the registration statement declared effective August 24, 2010, signed by SPU, CEO Xue, CFO Liu, VP Yan, and Directors Wang, Smagula, and Ko.

- A prospectus dated August 26, 2010.

- An annual report for FY 2010 on SEC Form 10-K filed April 1, 2011, and a subsequent amendment thereto, signed and certified by CEO Xue and CFO Liu, and also signed by VP Yan and Directors Wang, Smagula, and Ko. SkyPeople Fruit Juice, Inc., <u>SEC Form 10-K for Year Ended Dec. 31, 2010</u>[2] (the "2010 Form 10-K")).  (The 2010 Form 10-K discloses the alleged related-party transaction but restates the allegedly false 2009 financial figures).

(<u>Id.</u> ¶ 258.ii-vii, 260)

---

[1] Available at http://www.sec.gov/Archives/edgar/data/1066923/000141588910000060/sp10k-dec312009.htm

[2] Available at http://www.sec.gov/Archives/edgar/data/1066923/000141588911000198/spu10k-dec312010.htm

III.     Allegedly False Statements

a.      Non-reporting of Yingkou Transaction

On May 26, 2008, SPU agreed to purchase Yingkou from Shaanxi Boai

Pharmaceutical & Scientific Development Co., Ltd. ("Boai").  (Id. ¶ 119.)  Thereafter, the

transaction was "delayed" for some time.  (Id. ¶ 131.)  During this delay, on January 6, 2009,

CEO Xue and Director Yan purchased a 46% interest in Boai, through another company they

owned, giving them an indirect ownership interest in Yingkou.  (Id. at 119.)  Still during the

delay, on November 10, 2009, Xue and Yan sold their indirect ownership interest.  (Id. ¶ 21.)

SPU eventually purchased Yinkgou on November 25, 2009, for 22.7 million renminbi ("RMB").

(Id. ¶ 118.)

Plaintiffs allege that the other 54% of Boai was always related to SPU and that

Boai "was, at all times, a mere straw-man used by Yan and Xue to launder assets onto SPU's

balance sheets."  (Id. ¶ 28.)  Plaintiffs admit that "Boai was registered to other parties" (id. ¶

129), but plaintiffs allege that when Boai received its business license from the Chinese State

Administration for Industry and Commerce (the "SAIC"), CEO Xue "signed his name to pick up

the paperwork" and that "[t]here is no good reason for Xue to pick up founding documents for an

unrelated third party."  (Id. ¶ 30.)  Plaintiffs further allege that Boai purchased Yingkou on April

2, 2008, from another entity wholly owned by Xue and Yan, Shaanxi Hede Investment

Management Co, Ltd. ("Hede").  (Id. ¶ 124.)  On April 11, 2008, Boai increased Yingkou's

registered capital from 8 million RMB to 20 million RMB.  (Id. at 126.)  As noted, SPU initially

agreed to purchase Yingkou on May 26, 2008, and eventually paid—on November 26, 2009—

22.7 RMB.

SPU did not include the Yingkou transaction as a related-party transaction in any

U.S. filing prior to the 2010 Form 10K.  (Id. ¶¶ 258, 260.)  In its 2010 Form 10-K, SPU disclosed

6

that it had concluded that the Yingkou transaction was a related-party transaction, as that term is defined by company policy and "the related SEC rules." (Id. ¶ 132.)  SPU explained:

> [M]anagement determined that the acquisition of Yingkou that was consummated in November 25, 2009 was a related party transaction that should have been subject to our policies and procedures governing related party transactions (Statement of Policies and Procedures with Respect to Related Party Transactions). Even though the ultimate purchase price of Yingkou paid by us was lower than the valuation appraised by a qualified third party, thus favorable to us, and there was no affiliation between the relevant directors and officers of the Company and the seller of Yingkou at the time Yingkou Acquisition was initially approved by the shareholders of SkyPeople (China) and the affiliation between the relevant directors and officers and the seller of Yingkou came into existence while the transaction was being delayed and such affiliation ended prior to the consummation of the acquisition, management determined that the failure to disclose the relevant affiliation while the transaction was pending was a material weakness in our disclosure controls and procedures . . . .

> Based on that evaluation, our CEO and CFO concluded that because of the lack of disclosure related to the acquisition of Yingkou, our disclosure controls and procedures were not effective as of December 31, 2010.

(Id. ¶ 131); 2010 Form 10-K at 47.

Plaintiffs allege that defendants instituted the above-referenced Policies and Procedures after having failed to disclose related-party transactions in the past.  (CAC ¶¶ 102-109.)  During the two business days following SPU's disclosure, SPU's stock price fell from $4.41 per share to $3.57 per share, or over 23%, on "heavy trading volume."  (Id. ¶ 306.)

### b.   Alleged Misstatement of FY 2009 Financial Figures

In addition to SPU's required SEC filings, SPU's Chinese subsidiaries were required to file, and did file, annual reports with the SAIC.  (Id. ¶ 136.)  The penalties for false filings include fines and revocation of the entity's business license.  (Id. ¶ 137.)  SAIC filings must be signed by the legal representative of the company, who must state, "I confirm that the content of the submitted company's annual inspection report is true."  (Id.)  The legal representative of SkyPeople China and Yingkou is H. Xue (CFO Xue's brother and SPU's

controlling shareholder); the legal representative of Huludao is VP Yan; the legal representative of Qiyiwangguo is Ke Lu, a former SPU Director.  (Id. ¶ 139.)

On June 1, 2011, an American investment fund, Absaroka Capital Management, published a coverage report on SPU claiming that there were discrepancies between SPU's SEC and SAIC filings.  (CAC ¶ 148; Absaroka Report 6 (Marder Decl., Dec. 21, 2011, Ex F).)  In the report, Absaroka analyst Kevin Barnes stated that the 2009 SAIC filings of SPU's China-based subsidiaries, when consolidated, presented sharply different financial figures than those in SPU's 2009 Form 10-K, including sharply lower revenues, net income, cash, and assets.  (Absaroka Report at 6.)  Most dramatically, SPU's 2009 Form 10-K stated SPU's revenue as $59.2 million, whereas the consolidated SAIC filings allegedly showed combined revenue of $5.2 million.  (Id.)  Barnes attached the SAIC filings on which he based his analysis.  (Id., Attachs.)  Barnes also stated that, based on in-country investigation, SPU's actual operations were far smaller than claimed in SEC filings.  (Id. 7-18.)  Barnes stated, among other things, that the Huludao and Yingkou facilities were largely idle and that SPU's products were generally unavailable at the retail outlets at which SPU claimed they were available.  (Id.)  Barnes further stated that SPU's reported margins and inventory turnover were remarkably higher than, and their reported marketing expenditures remarkably lower than, their industry peers.  (Id. 18-22.)  Although SkyPeople allegedly attributed 36% of its 2009 revenue to kiwifruit products, Barnes concluded, based on "discussions with the company's customers, industry experts, and plant managers, and two former executives," that "the market for kiwifruit concentrate and [SPU]'s production [were] miniscule."  (Id. at 21.)  On the day that the Absaroka Report was released, SPU's stock price fell 18% on "unusually heavy" trading volume.  (CAC ¶ 306.)

SPU issued a rebuttal to the Absaroka Report in a press release later filed with the

SEC.  (CAC ¶ 150 & Ex. 3.)  According to a published report, SPU claimed that the Absaroka Report's "so-called SAIC reports are entirely fabricated reports which contain materially false information about [SPU]."[3]  (Marder Decl., Dec 21, 2012, Ex. G, GeoInvesting, SkyPeople Fruit Juice: Investor Alert (June 9, 2011) (the ("GeoInvesting Alert").)  SPU allegedly further claimed that "[t]he auditor of the so-called SAIC reports contained in the [Absaroka Report] as  shown on its company stamp did not appear to be the same auditor that actually audited the financial statements of [SPU's Chinese] subsidiaries."  (Id. at 1.)  In the press release, SPU claimed to summarize the numbers that actually appeared in the SAIC filings of its subsidiaries.  (CAC Ex. 3.)  The numbers in the press release roughly match the numbers in SPU's 2009 SEC filings. (Compare id., with 2009 Form 10-K at 78.)

In June 2011, GeoInvesting, an American analyst firm, posted an "Investor Alert" questioning SPU's rebuttal and corroborating the Absaroka Report.  (Marder Decl., Dec. 21, 2011, Ex. G., GeoInvesting Alert.)  GeoInvesting was able to corroborate the Absaroka numbers in part, stating, "[T]he GeoTeam had recently obtained its own set of SPU's SAIC filings.  We currently only possess the filings of two out of four [of] SPU's subsidiaries.  Although we have not confirmed that we pulled these filings from a different source than Absaroka's, it turns out that the data contained within them match the SAIC information disclosed by Absaroka right down to the auditor [stamp]."  (Id. at 1.)

Plaintiffs allege that in September 2011 they obtained partial SAIC filings that corroborate the Absaroka Report.  First, on September 22, 2011, plaintiffs obtained a copy of the

---

[3] SPU later sued Absaroka Capital Management, alleging that Barnes had misrepresented the contents of SPU's SAIC filings. (CAC ¶ 160 (citing SkyPeople Fruit Juice, Inc. v. Absaroka Capital Mgmt., LLC, 11-CV-283F (D.Wyo.).)  Allegedly, Absaroka's answer included affidavits from three Chinese attorneys, all of whom swore that the SAIC filings they had obtained for that litigation had  been obtained directly from the SAIC.  (Id.)  Allegedly, the Chinese lawyers' filings match filings later obtained by plaintiffs, which themselves corroborate the Absaroka Report.  (Id. ¶¶ 155-160.)

SAIC filings for SkyPeople China.  (CAC ¶ 154 & Ex. 4.)  The SAIC filings plaintiffs obtained

were missing many of the required documents, which plaintiffs allege was the result of

intentional manipulation.  (Id. ¶ 154.)  However, the financial figures that were included

allegedly match those cited in the Absaroka report, including those for revenue, cost of revenue,

operating expenses, and net income.  (Id. ¶ 158 tbl. 1)  Second, on September 24, 2011, plaintiffs

obtained the SAIC filings for Qiyiwangguo.  (Id. ¶ 157 & Ex. 5.)  The figures in the

Qiyiwangguo filings obtained by plaintiffs also allegedly match those cited in the Absaroka

Report as to revenue, cost of revenue, operating expenses, operating income, tax, and net

income.  (Id. ¶ 158 tbl. 2.)

        Plaintiffs further allege that, independent of their corroboration of the Absaroka

report, the SkyPeople China and Qiyiwangguo filings that they obtained conflict with SPU's

2009 Form 10-K for other reasons.  First, SkyPeople China's incomplete SAIC filings contain a

narrative description of SkyPeople China's "reason for loss."  (Id. ¶ 156 & Ex. 4.)  The narrative

states, "Since our primary products are produced for export, our sales was [sic] negatively

affected by the economic crisis, and we had a substantial decline in sales . . . ."  (Id.)  Allegedly,

this narrative conflicts with SPU's 2009 Form 10-K, which shows that SPU, which has no

revenue-generating companies other than those owned by SkyPeople China, had an increase in

revenue of over $18 million.  (Id.); see 2009 Form 10-K at 3, 78.  Second, the Qiyiwangguo

SAIC filing states Qiyiwangguo's revenue as 2 million RMB.  (CAC ¶ 158 tbl. 2 & Ex 5.)

SPU's rebuttal press release states that Qiyiwangguo's contribution to total revenues was 265

million RMB.  (Id. Ex. 3.)  Therefore, plaintiffs allege, looking only to this discrepancy—and

setting against Qiyiwangguo's account all of SPU's alleged 48 million RMB elimination of

intercompany balances—Qiyiwangguo's 2009 revenues, and therefore  SPU's 2009 revenues,

are overstated by at least 214 million RMB, or $31 million, or 113%.  (Id. ¶ 163.)  Third, the

alleged Qiyiwangguo filing also indicates that SkyPeople China owns only 70.1% of

Qiyiwangguo, not 91.15%, as indicated on all of SPU's SEC filings.  (Id. ¶¶ 284-286.)

          c.        Alleged Misstatement of FY 2008 Financial Figures

        The entirety of plaintiffs' allegations regarding FY 2008 are as follows (with one

table excluded):

> In 2008, SkyPeople's main operating assets were SkyPeople China and
> Qiyiwangguo.[4]
>
> The only other operating asset owned by SkyPeople was Huludao.
> Huludao only produces apple juice and apple aroma. According to SkyPeople's
> annual report on Form 10-K for FY 2009, apple juice and apple aroma accounted
> for 16.5% of revenue. Thus, Huludao accounted for (at most) 16.5% of revenue.
>
> However, Huludao probably accounted for less than 16.5% of revenue.
> According to SkyPeople's SEC filings, until June of 2008, SkyPeople China rather
> than Huludao produced apple juice and apple aroma out of the Huludao facility.
> Revenues produced by the Huludao facility between January 1, 2008 and June of
> 2008 should therefore be recognized, and probably were recognized, by
> SkyPeople China.
>
>     . . . .
>
> Huludao, at a maximum, accounted for 16.5% of SkyPeople's total
> revenues. Even generously assuming that this is 16.5% of SkyPeople's revenues
> as reported to the SEC, this means Huludao accounted for at most $6,872,000 in
> revenue. Adding this generous amount to the amount reported to the SAIC for
> SkyPeople's other subsidiaries means that, at most, SkyPeople earned
> $17,406,000 in revenue. Thus, SkyPeople's SEC filings overstated revenue by at
> least 139% for FY 2008. The 2008 financial statements were included in the
> Registration Statement.
>
> Further, unless Huludao made $12 million net income on at most
> $6,872,000 in revenue, SkyPeople overstated its income -- turning what was
> almost certainly a loss into a $10 million profit.

---

[4] According to SPU's 2008 Form 10-K, SkyPeople China did not exist in 2008.  The entity that would become
SkyPeople China in 2009 was then named Shaanxi Tianren Organic Food Co., Ltd.  Compare 2008 Form 10-K at 2,
with 2009 Form 10-K at 3.

Therefore, SkyPeople's 2008 financial statements misstated SkyPeople's revenue and net income.[5]

(Id. ¶¶ 165-172.)

## DISCUSSION

I.    Legal Standard

a.    Rule 8

Defendants SPU, CFO Liu, and Directors Fields, Ko, and Smagula jointly move to dismiss all claims in the complaint asserted against them.  (ECF No. 49.)  Defendant Rodman separately moves to dismiss any claims asserted against it by plaintiffs Lewy, Lee, and Klement.[6] (ECF No. 52.)  Rule 8(a)(2), Fed. R. Civ. P., requires plaintiffs to offer only a "short and plain statement of the claim showing that the pleader is entitled to relief."  To survive a motion to dismiss a complaint governed by Rule 8, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  In assessing plausibility, courts draw all reasonable inferences in favor of the non-movant.  See In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007).  However, legal conclusions are not entitled to any assumption of truth, and a court assessing the sufficiency of a complaint disregards them.  Iqbal, 556 U.S. at 678.  Instead, the court examines only the well-pleaded factual allegations, if any, "and then determines whether they plausibly give rise to an entitlement to relief."  Id.

In considering this motion, the Court may review not only the complaint but also

---

[5] Plaintiffs do not identify the "2008 financial statements" to which they are referring.

[6] The other defendants—CEO Xue, VP Yan, Director Wang, and H. Xue—have neither appeared in this action, answered the complaint, nor filed any responsive motion.  The Court does not address the sufficiency of the claims against these defendants except insofar as the parties' arguments require the Court to state conclusions as to the Officer or Director Defendants generally.

"any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference, as well as public disclosure documents required by law to be, and that have been, filed with the SEC."  Rothman v. Gregor, 220 F.3d 81, 88-89 (2d Cir. 2000) (citations omitted).

b.      Rule 9(b) and the PSLRA

A complaint charging securities fraud must satisfy the heightened pleading requirements of Rule 9(b), Fed. R. Civ. P., and the Private Securities Litigation Reform Act (the "PSLRA"), 15 U.S.C. § 78u-4.  ECA & Local 134 IBEW Joint Pension Tr. v. J.P. Morgan Chase Co., 553 F.3d 187, 196 (2d Cir. 2009).  Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  The Second Circuit interprets that rule to require that a complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why statements were fraudulent."  Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993).  Although "[m]alice, intent, knowledge and other conditions of a person's mind may be alleged generally[,]" Rule 9(b), Fed. R. Civ. P., the Second Circuit has admonished that "we must not mistake the relaxation of Rule 9(b)'s specificity requirement regarding condition of mind for a license to base claims of fraud on speculation and conclusory allegations," Acito v. IMCERA Group, Inc., 47 F.3d 47, 52 (2d Cir. 1995) (quotations omitted).  Instead, plaintiffs must "allege facts that give rise to a strong inference of fraudulent intent."  Id.

The PSLRA mandated a uniform national pleading standard for private securities fraud actions that mimics the standard the Second Circuit had derived from Rule 9(b), except insofar as the PSLRA requires particularity in the pleading of the requisite mental state.  See Novak v. Kasaks, 216 F.3d 300, 310 (2d Cir. 2000) ("[T]he PSLRA effectively raised the nationwide pleading standard to that previously existing in this circuit and no higher (with the

exception of the 'with particularity' requirement).")  Courts must dismiss pleadings that fail to

adhere to the requirements of the PSLRA.  <u>See</u> 15 U.S.C. § 78u-4(b)(3)(A); <u>see</u> <u>also</u> <u>Novak</u>, 216

F.3d at 307.

<blockquote>

c. <u>Rombach</u> Does Not Require Application of Rule 9(b) to the <u>Securities Act Claims.</u>

</blockquote>

In this case, plaintiffs bring claims pursuant to both the Securities Act of 1933

(the "Securities Act"), 15 U.S.C. § 77a <u>et.</u> <u>seq.</u>, and the Securities Exchange Act of 1934 (the

"Exchange Act"), 15 U.S.C. § 78a <u>et.</u> <u>seq.</u>   There is no dispute that Rule 9(b)—and the

PSLRA—apply to claims brought pursuant to Section 10(b) of the Exchange Act, which creates

liability for the use of "manipulative and deceptive devices" in connection with the sale of

securities.  <u>See</u> <u>Part</u> <u>III</u>, <u>infra</u>.  However, the parties dispute the application of Rule 9(b) to

plaintiffs' Securities Act claims.  The relevant portions of the Securities Act, Sections 11 and

12(a)(2), create liability for false or misleading statements in registration statements and

prospectuses, without regard to an intent to manipulate or deceive.  <u>See</u> 15 U.S.C. §§ 77k-l.

Because "fraud is not an element or a requisite to a claim under Section 11 [or 12] . . . a plaintiff

need allege no more than negligence to proceed."  <u>Rombach v. Chang</u>, 355 F.3d 164, 171 (2d

Cir. 2004).  Therefore, Section 11 and 12 claims are generally subject only to the relaxed

pleading requirements of Rule 8.

However, the Second Circuit held in <u>Rombach</u> that because Rule 9(b) "applies to

'all averments of fraud,' . . . Section 11 and Section 12(a)(2) claims that do rely upon averments

of fraud are subject to the test of Rule 9(b)."  <u>Id.</u>  (quoting Rule 9(b)).[7]  In that case, the court

held that the plaintiffs' Section 11 claims against certain corporate officers did sound in fraud

because the "wordings and imputations of the complaint [were] classically associated with

---

[7] Rule 9(b), as amended, applies to all "allegations of fraud."  Rule 9(b), Fed. R. Civ. P. (West 2012).

fraud." Id. at 172.  The Court laid emphasis on the language of the Section 11 allegations, which stated that the registration statement was "'inaccurate and misleading,' that it contained 'untrue statements of material facts,' and that 'materially false and misleading statements' were issued." Id.  The Court also found support in the Ninth Circuit's application of Rule 9(b) to a Section 12 claim "'where the gravamen of the complaint [was] plainly fraud and no effort [was] made to show any other basis for the claims.'"  Id. (quoting In re Stac Elecs. Litig, 89 F.3d 1399, 1405 n.2 (9th Cir. 1996)).  Similarly, the court relied upon Judge Preska's application of Rule 9(b) to Securities Act claims in a case "where 'plaintiffs [made] little, if any, effort to differentiate their asserted negligence claims from the fraud claims . . . [and] merely disavow[ed] any allegations that would make Rule 9(b) applicable . . . without specifying the allegations that would support a negligence cause of action.'"  Id. (citing and quoting In re Ultrafem Sec. Litig., 91 F. Supp. 2d. 678, 690-91 (S.D.N.Y. 2000)).  Thus, Rombach teaches that when a putative Securities Act claim recites language associated with fraud, incorporates all of the allegations otherwise supporting a fraud claim, and fails to specify a basis for a non-fraud claim, then Rule 9(b) applies.  See id. at 171-72; Rombach v. Chang, No. 00 CV 0958, 2002 WL 1396986, at *4 (S.D.N.Y. June 7, 2002);  see also Ultrafem, 91 F. Supp. 2d. at 691.

At the same time, "[i]t is clear that the Second Circuit did not intend Rombach as an instruction that all § 11 pleadings should be subjected to the Rule 9(b) standard."  In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611, 632 (S.D.N.Y. 2007) (Lynch, J.).  As Rombach itself notes, "[t]he same course of conduct that would support a [Section 10(b)] claim may as well support a Section 11 claim or a claim under Section 12(a)(2)."  355 F.3d at 171.  Indeed, whenever a plaintiff can make out a Section 10(b) claim based on false statements in a registration statement or prospectus, that plaintiff will have necessarily made out a Section 11 or 12(a)(2) claim against

15

at least some of the same potential defendants.  <u>Compare</u> 15 U.S.C.§§ 77k & 77l(a)(2), <u>with</u> 15

U.S.C. 78j.  Accordingly, a plaintiff may bring separate lawsuits, one alleging a Section 10(b)

claim governed by Rule 9(b) and the other alleging a Section 11 or 12(a)(2) claim governed by

Rule 8, based on the same course of conduct.  <u>Compare, e.g.</u>, <u>Footbridge Ltd. v. Countrywide</u>

<u>Home Loans, Inc.</u>, No. 09 CV 4050, 2010 WL 3790810 (S.D.N.Y. Sept. 28, 2010) (PKC)

(Exchange Act claims), <u>with</u> <u>Footbridge Ltd. Trust v. Countrywide Fin. Corp.</u>, 770 F. Supp. 2d

618 (S.D.N.Y. 2011) (PKC) (Securities Act claims filed following dismissal of Exchange Act

claims).  The Court does not read <u>Rombach</u> to mean that the joinder of a fraud claim and a non-

fraud claim in the same complaint against the same defendants necessarily means that both

claims are governed by Rule 9(b).  This would create a perverse incentive to file separate actions.

Even when "it is clear that plaintiffs believe [and plead] that . . . most, if not all, of the

defendants, were engaged in a massive fraud . . . [t]hat fact does not take away plaintiffs' right to

plead in the alternative that defendants violated provisions requiring only negligence."  <u>Refco</u>,

503 F. Supp. 2d at 632.

        A plaintiff may exercise sufficient care in the drafting of a complaint to allow a

court to evaluate Securities Act claims independently from Exchange Act claims.  <u>See</u> <u>Refco</u>,

503 F. Supp. 2d at 631-32; <u>Garber v. Legg Mason, Inc.</u>, 537 F. Supp. 2d 597, 612 (S.D.N.Y.

2008) (Chin, J.) <u>aff'd</u>, 347 F. App'x 665 (2d Cir. 2009).  In <u>Refco</u>, Judge Lynch held that the

plaintiffs adequately distinguished their Section 11 claim by "carefully structur[ing the

complaint] to draw a clear distinction between the negligence and fraud claims," "carefully

couch[ing the Securities Act section] in the language of negligence," and setting forth the

"relevant factual allegations . . . in a section called 'Defendants' Negligence.'"  <u>Refco</u>, 503 F.

Supp. 2d at 632.  Similarly, in <u>Garber</u>, Judge Chin found that plantiffs' Securities Act claims did

not sound in fraud when plaintiffs specifically alleged negligence, disclaimed fraud, and did not

rely on allegations of fraud in framing the Securities Act claims.  537 F. Supp. 2d at 612.  That is

to say, plaintiffs may adequately distinguish their Securities Act claims by creating a structural

and descriptive separation of those claims from the fraud claims in the same complaint.

    In this case, plaintiffs have structured the amended complaint in a manner that

mirrors the structure discussed in Refco:  "The Securities Act claims are found in the first half of

the complaint; the Exchange Act allegations, which include allegations of fraud by some—but

not all—of the defendants named in the Securities Act claims, are found in the second half of the

complaint."  Id. (citations omitted).  In plaintiffs' amended complaint, the scienter allegations,

quite deliberately, are not introduced until after the Securities Act claims are fully pled and are

not incorporated by reference into the Securities Act claims.  (Compare CAC ¶¶ 217-249, with

id. ¶¶ 252-332).  Also like Refco, and Garber, and unlike Rombach or Ultrafem, plaintiffs make

reference to a negligence-type theory to support their Section 11 claim, alleging that each of the

named defendants "owed to the purchasers . . . [a] duty to make a reasonable and diligent

investigation," that "[n]one . . . made a reasonable investigation," that "material misstatements"

were disseminated as a result, and that plaintiffs "are entitled to damages."  (CAC ¶¶ 225-27,

231.)  Therefore, plaintiffs adequately distinguish their Securities Act claims, relieving them of

the heightened pleading requirements of Rule 9(b).

   II.  Securities Act Claims

     a.  Sections 11 and 12

    Plaintiffs claim that the defendants violated Sections 11 and 12 of the Securities

Act, 15 U.S.C. §§ 77k-l, by incorporating their allegedly false statements into the registration

17

statement and prospectus for their second public offering.[8]  Section 11 of the Securities Act, 15

U.S.C. § 77k, imposes civil liability on issuers and signatories, such as officers of the issuer and

underwriters, of a registration statement that contains materially misleading statements or

omissions.  Id. § 77k(a).  "To state a claim under section 11, the plaintiff must allege that: (1) she

purchased a registered security, either directly from the issuer or in the aftermarket following the

offering; (2) the defendant participated in the offering in a manner sufficient to give rise to

liability under section 11; and (3) the registration statement 'contained an untrue statement of a

material fact or omitted to state a material fact required to be stated therein or necessary to make

the statements therein not misleading.'"  In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d

347, 358-59 (2d Cir. 2010) (quoting 15 U.S.C § 77k(a)).

Section 12(a)(2) of The Securities Act, 15 U.S.C. § 77l(a)(2), provides "similar

redress where the securities at issue were sold using prospectuses or oral communications that

contain material misstatements or omissions."  Id. at 359.  "The elements of a prima facie claim

under section 12(a)(2) are: (1) the defendant is a "statutory seller"; (2) the sale was effectuated

"by means of a prospectus or oral communication"; and (3) the prospectus or oral

communication "include[d] an untrue statement of a material fact or omit[ted] to state a material

fact necessary in order to make the statements, in the light of the circumstances under which they

were made, not misleading." Id. (quoting 15 U.S.C. § 77l(a)(2)).

For liability to attach under either section, the alleged misstatements or omissions

must be material.  See 15 U.S.C. §§ 77k(a) & 77l(a)(2).  The materiality of a misstatement or

omission depends on whether "there is a substantial likelihood that a reasonable shareholder

---

[8] Defendant Rodman has moved to dismiss the Section 11 and 12 claims of plaintiffs Lewy, Lee, and Klement, for
failure to plead facts establishing standing.  Plaintiffs, in their opposition papers, clarify that only Padnos asserts
these claims.  (Pl. Mem. 65.)  Accordingly the Section 11 and 12 claims in the complaint survive only insofar as
alleged by Padnos.

would consider it important in deciding how to [act]." TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)).  In order for the misstatement or omission to be material, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Id.  "Because materiality is a mixed question of law and fact, in the context of a Fed. R. Civ. P. 12(b)(6) motion, a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." ECA, 553 F.3d at 197 (quotations omitted).

In this case, defendants SPU, Liu, Ko, Fields, and Smagula contend that plaintiffs have not identified any misstatements or omissions and that, in any event, the Yingkou transaction was not material.   Turning first to the existence of misstatements or omissions, plaintiffs have plausibly alleged both that the 2009 and 2008 financial statements contained in SPU's U.S. filings are false and that the Yingkou transaction was a related-party transaction.  As regards the financial statements, plaintiffs allege that the 2009 and 2008 financial statements contained in the U.S. filings do not match the consolidated SAIC filings of SPU's only operational subsidiaries for the same time-periods.  (CAC ¶¶ 133-72).  Granting all reasonable inference in plaintiffs' favor, these alleged facts plausibly establish the falsity of the 2009 and 2008 financial statements contained in the U.S. filings.  As regards the Yingkou transaction, plaintiffs allege that SPU determined that the Yinkgou transaction should have been disclosed according to SPU's own policies and "the related SEC rules."  (Am. Compl. ¶ 132); 2010 Form

10-K at 48.  Plaintiffs' own alleged admission plausibly establishes that the Yingkou Transaction was a related-party transaction that should have been disclosed.[9]

The omission of the Yingkou transaction was also not "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance," ECA, 553 F.3d at 197 (quotations omitted).  Plaintiffs allege that SPU had failed in the past to disclose related-party transactions, that SPU announced a new disclosure policy to demonstrate its commitment to full disclosure, and that the omission and later revelation of the related-party nature of the Yingkou transaction demonstrated that SPU had not overcome its disclosure problems.  (CAC ¶¶ 94-132.)  In light of SPU's alleged attempt to demonstrate that it had overcome its disclosure problems, a reasonable investor may well have viewed a new non-disclosure as altering the "'total mix' of information made available," TSC Indus., 426 U.S. at 449.  Defendants point out that SPU had already disclosed (a) its earlier related-party disclosure problems, and (b) that it had purchased Yingkou.  (See Mem. Supp. Mot. to Dismiss of Defs. SPU, Liu, Ko, Smagula & Fields ("SPU Mem.") 38-39.)  But neither of these disclosures addresses the very thing that is alleged to be material about Yingkou, to wit, that it was another related-party transaction.  Accordingly, plaintiffs state Section 11 and 12 claims against the moving defendants based on the omission of the Yingkou transaction as well as on the alleged falsity of the 2009 and 2008 financial statements.

---

[9] Plaintiffs offer a variety of other theories to support the allegation that failing to disclose the Yingkou transaction was a material omission, or that the failure to disclose engendered other falsehoods.  (Pl. Mem. 16-28).  The Court examines each in detail in the context of plaintiffs' Section 10(b) claim.  See Part III.b.3, infra.  For purposes of the examination of plaintiffs' Section 11 and 12 claims under the relaxed pleading standards of Rule 8, the above-mentioned allegations suffice to establish that the Yingkou transaction was a related-party transaction.

b.       Section 15

Plaintiffs also allege that all individual defendants except Director Fields are liable as control persons of SPU under Section 15 of the Securities Act, 15 U.S.C. § 77o. Section 15 imposes joint and several liability on "[e]very person who, by or through stock ownership, agency, or otherwise . . . controls any person liable under [Section 11 or Section 12] . . . unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist." Id. § 77o(a).  To establish Section 15 liability, a plaintiff must show a "primary violation" of Section 11 or 12 and control of the primary violator by defendants.[10]  See In re Lehman Bros. Mortgage-Backed Sec. Litig., 650 F.3d 167, 185 (2d Cir. 2011).

Control entails "'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'"  SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1473 (2d Cir. 1996) (quoting 17 C.F.R. § 240.12b-2).  "To prevail on a § 15 claim, '[a] plaintiff is required to prove actual control, not merely control person status.'"  In re Refco, 503 F. Supp. 2d at 637 (quoting In re IPO Secs. Litig., 241 F. Supp. 2d 281, 352 (S.D.N.Y. 2003) (emphasis omitted)).  Officers, directors, and audit committee members who sign public financial reports are deemed to have actual control over the contents of those reports.  See, e.g., In re Alstom SA, 406 F. Supp. 2d 433, 487 (S.D.N.Y. 2005) ("[I]f that . . . officer or director has signed financial statements containing materially false or misleading statements . . . control as to the financial statements is

---

[10] The Second Circuit has not passed on whether "culpable participation" is an element of a Section 15 claim.  See In re Lehman Bros. Mortgage-Backed Sec. Litig., 650 F.3d 167, 186 (2d Cir. 2011).  The statute, on its face, requires plaintiffs to establish only a primary violation and defendant's control of the violator.  15 U.S.C. § 77o(a). Absent further guidance from the Second Circuit, this Court declines to impose a culpable participation pleading requirement.

sufficiently pled."); In re Livent, Inc. Sec. Litig., 78 F. Supp. 2d 194, 222 (S.D.N.Y. 1999)

(control satisfied as to "outside director and audit committee member who signs off on the

financials"); In re WorldCom, Inc. Sec. Litig., 294 F. Supp. 2d 392, 420 (S.D.N.Y. 2003) ("[J]ust

what is a signature on an SEC filed document meant to represent if it does not represent a degree

of responsibility for the material contained in that document?")

   In this case, plaintiffs establish a Section 15 claim against the relevant moving

defendants, i.e., CFO Liu and Directors Ko and Smagula, based on their control over SPU's

issuance of the Registration Statement.[11]   First, plaintiffs have successfully stated a claim that

SPU violated Section 11 by including its allegedly false 2009 and 2008 financial statements in,

and omitting a related-party transaction from, the registration statement.  See Part II.a, supra.

Second, plaintiffs plausibly establish that Liu and the named Director Defendants had actual

control over SPU's publication of the allegedly false statements.  Plaintiffs allege that Liu, Ko,

and Smagula all signed the registration statement.  (CAC ¶¶ 63, 67, 70.)  As senior corporate

officers or company directors sitting on the audit committee, these defendants plausibly had

actual control over the public filings that they signed.  See In re Alstom, 406 F. Supp. 2d at 488;

In re Livent, 78 F. Supp. 2d at  222; In re WorldCom, 294 F. Supp. 2d at 420.

### III.  Exchange Act Claims

   a.  Section 10(b)

   Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), is the Act's general

antifraud provision.  This provision makes it unlawful to "use or employ, in connection with the

purchase or sale of any security . . . any manipulative or deceptive device or contrivance in

---

[11] Plaintiffs offer no nonconclusory factual allegations plausibly establishing that the moving defendants had actual control over the SPU's issuance of the prospectus.

contravention of such rules and regulations as the Commission may proscribe." Id.  The SEC rule implementing the statute, Rule 10b–5, prohibits "mak[ing] any untrue statement of a material fact or [omitting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b–5(b).  In order to succeed on a claim, a "plaintiff must establish that the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff."  ECA, 553 F.3d at 197 (quotations omitted).  Examination of plaintiffs' Section10(b) claim requires revisiting many of the allegations discussed above but subjecting them to the heightened pleading standards of Rule 9(b) and the PSLRA.

> 1.    Plaintiffs Sufficiently Allege a Section 10(b) Claim Based on the Filing of False Financial Statements for FY 2009.

Plaintiffs allege that SPU and the Officer Defendants violated Section 10(b) of the Exchange Act by knowingly or recklessly making false financial statements regarding its 2009 performance and business structure in its U.S. filings.  Defendants SPU and Liu, the only moving defendants named in the Section 10(b) claim, assert that plaintiffs fail to (1) identify an actionable false statement, (2) establish a strong inference of scienter, or (3) plead loss causation. (SPU Mem. 13-36.)  For the reasons explained below, defendants' arguments fail.

> A.    Plaintiffs Plead Falsity with Particularity.

Plaintiffs allege with sufficient particularity the falsity of SPU's statements of its 2009 performance and structure.  In order to meet the heightened pleading standard, plaintiffs "need only plead with particularity sufficient facts to support [their] beliefs [that the statements were false]."  Novak, 216 F.3d at 313-14 (emphasis removed).  Plaintiffs meet this standard with

the following particularized allegations:  Plaintiffs allege that the Absaroka Report details significant discrepancies between the 2009 SEC filings and the consolidated SAIC filings, including a 90% difference in total revenue.  (CAC ¶ 149; see Absaroka Report 6.)  Plaintiffs further allege that the GeoInvesting Alert corroborated the Absaroka Report.  (CAC ¶ 152; see GeoInvesting Alert 1.)  Plaintiffs further allege that plaintiffs' own research corroborated the Absaroka report and revealed further inconsistencies between the 2009 SAIC and SEC filings, including that SkyPeople China described revenue losses, that Qiyiwangguo's contribution to SPU's revenue was a fraction of that stated in the SPU rebuttal press release, and that SPU owns 20% less of Qiyiwangguo than reported in the 2009 SEC filings.  (Id. ¶¶ 156, 163, 286.) Plaintiffs also allege that the Absaroka Report stated that the scope of operations of SPU's Chinese subsidiaries appeared sharply smaller than what SPU reported and that SPU's claimed margins and marketing expenses were difficult to square with the margins and expenses of industry peers.  (Id. ¶¶ 149, 289-299; see Absaroka Report 7-22.)  On this basis, the amended complaint sufficiently alleges that the SEC statements do not match the SAIC statements and that the SEC statements are false.

Defendants' arguments against plaintiffs' reliance on the Absaroka Report, the GeoInvesting Alert and plaintiffs' purported partial SAIC filings are unavailing.  First, plaintiffs argue that the Absaroka Report and GeoInvesting Alert reports are "unreliable" because they contain disclaimers and because their authors intended to short SPU stock.  (SPU Mem. 19-20.) A motion to dismiss is not the proper vehicle to test the credibility of witnesses or the manner in which the plaintiffs will attempt to prove their allegations.  See, e.g., United States v. All Right, Title & Interest in Five Parcels of Real Prop. & Appurtances Thereto Known as 64 Lovers Lane, 830 F. Supp. 750, 756 (S.D.N.Y. 1993). ("We do not test the sufficiency of evidence on motions

to dismiss.  Likewise, we do not assess the admissibility or weight that should be afforded to evidence.")  Instead, on a motion to dismiss, the court must accept plaintiffs' factual allegations as true and credit all reasonable inferences in plaintiffs' favor.  In re Elevator Antitrust Litig., 502 F.3d at 50.  For purposes of this motion, the analysts' reports exist as alleged, and the amended complaint plausibly alleges that the statements contained therein are true.

Second, neither the Absaroka Report authored by Kevin Barnes, nor the GeoInvesting Alert attributed to the "GeoTeam" is—or relies upon—a "confidential" source to a degree that undermines particularity of plaintiffs' pleadings.  The Second Circuit clarified that "our reading of the PSLRA rejects any notion that confidential sources must be named as a general matter."  Novak, 216 F.3d at 313.  Instead, plaintiffs must meet the general standard of "plead[ing] with particularity sufficient facts to support [their] beliefs."  Id. at 314.  Therefore:

> Where plaintiffs rely on confidential personal sources but also on other facts, they need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false. Moreover, even if personal sources must be identified, there is no requirement that they be named, provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.

Id.

Here, to the degree that the analysts' reports constitute or contain anonymous sources, they are also described with adequate particularity, and their statements are corroborated by other facts.  In the first place, the authors of the reports themselves are named:  Kevin Barnes, on behalf of Absaroka, and the "GeoTeam."  As plaintiffs point out, the Absaroka author was sufficiently identified for defendants to sue him, alleging that his SAIC filings were false.  (Pl. Mem. 32 n. 13 (citing SkyPeople Fruit Juice v. Absaroka Capital Mgmt, 11 Civ. 238 (D. Wyo. 2011)).  In response, Absaroka presented affidavits from three Chinese lawyers swearing that the

SAIC filings they obtained for that litigation had been obtained directly from the SAIC.  (CAC ¶ 160).  The Chinese lawyers' filings allegedly match the filings obtained by the present plaintiffs (id.), and therefore also corroborate the Absaroka Report and the GeoInvesting Alert.  Furthermore, the filings obtained by plaintiffs—and, by extension, the Chinese lawyers—contain revenue and income figures that tend to corroborate the findings of Absaroka's unnamed "investigators," to wit, that SkyPeople had low production and low retail presence.  The reverse is also true:  The findings of the investigators corroborate the poor numbers in the SAIC filings.  Notably, the bases for the investigators findings are set forth in detail, including visits to stores and production facilities, with accompanying photographs.  (See Absaroka Report 10-17.)  In sum, the sources, and the sources' sources, are adequately identified and/or described, and are in any event sufficiently corroborated, to plead with particularity the falsity of the financial statements in the 2009 SEC filings.

B.  Plaintiffs Raise a Strong Inference of Scienter.

In order to plead scienter adequately under the PSLRA, a plaintiff must plead "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u–4(b)(2).  The requisite state of mind in a Section 10(b) action is an intent "'to deceive, manipulate, or defraud.'"  Tellabs v. Makor Issues & Rigts, Ltd., 551 U.S. 308, 319 (2007) (citing and quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193-94 & n. 12 (1976)).  "In addition to intent, recklessness is a sufficiently culpable mental state for securities fraud in this circuit."  ECA, 553 F.3d at 198.  "Recklessness is defined as 'at the least, . . . an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'"  Id. (quoting Novak, 216 F.3d at 308 (quotations omitted)).

"The inquiry . . . is whether all of the facts alleged, taken collectively, given rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Tellabs, 551 U.S. at 322-23. "The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? . . . [A] court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." Id. at 323-24. Ultimately, "[a] complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. at 324.

"The requisite scienter can be established by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." ECA, 551 F.3d at 198. "Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry. Rather, the 'motive' showing is generally met when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit." Id (citations omitted). If plaintiffs cannot make a "motive" showing, they may avail themselves of the "strong circumstantial evidence prong, 'though the strength of the circumstantial allegations must be correspondingly greater' if there is no motive." Id. at 198-99 (quoting Kalnit v. Eichner, 264 F.3d 131, 142 (2d Cir. 2001)). "At least four circumstances may give rise to a strong inference of the requisite scienter: where the complaint sufficiently alleges that the defendants (1) 'benefitted in a concrete and personal way from the purported fraud'; (2) 'engaged in deliberately illegal behavior'; (3) 'knew facts or had access to information

suggesting that their public statements were not accurate'; or (4) 'failed to check information they had a duty to monitor.'" Id. at 199 (quoting Novak, 216 F.3d at 311).

When plaintiffs allege that corporate officers knew facts or had access to information suggesting that their public statements were not accurate or failed to check information they had a duty to monitor, plaintiffs "'must specifically identify the reports or statements' that are contradictory to the statements made." Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce, 694 F. Supp. 2d 287, 299 (S.D.N.Y. 2010) (quoting Novak, 216 F.3d at 309) (emphasis removed). "[A]ctual identification of reports or other documents indicating defendants' recklessness as to their public statements' truth or falsity suggests an inference of scienter strong enough to survive motion to dismiss." Glaser v. The9, Ltd., 772 F. Supp. 2d 573, 588 (S.D.N.Y. 2011).

In this case, examining all of the factual allegations and taking them as a whole, plaintiffs raise a strong inference that CFO Liu was at least reckless as to the falsity of the statements in the 2009 Form 10-K. Liu signed and certified SEC filings that showed revenue growth of $18 million to $52 million, robust income, and a corporate structure that included a 90% ownership of Qiyiwangguo. (CAC ¶¶ 133, 149); 2009 Form 10-K at 3, 78. But the combined SAIC filings indicate weak revenue and negative income, narrate losses in sales, and describe 70% ownership of Qiyiwangguo. (CAC ¶¶ 149, 156, 286 & Ex. 4-5; see Absaroka Report 5-6.) The SAIC filings allegedly require certification from the Chinese company's legal representative. (CAC ¶ 137.) In this case, the legal representatives of the Chinese subsidiaries were, variously, H. Xue, SPU's controlling shareholder and CEO Xue's brother; VP Yan; and a former SPU director. (Id. ¶ 139.) That is to say, Liu, when making her statements to the SEC, overlooked or ignored specifically identified reports—reports of which she was or should have

been aware—contradicting the revenue, growth, income, and business structure that she reported to the SEC.  Liu's particularly alleged failure to heed the SAIC filings, or independently to know basic facts about her company's structure and performance, raises a strong inference of recklessness or intent to deceive.  Liu does not suggest, nor does the Court does discern, any plausible nonculpable explanation.

Plaintiffs also adequately allege that SPU is vicariously liable for Liu's alleged violations of Section 10(b).  The respondeat superior theory of liability remains viable in securities fraud cases despite the statutory enactment of "control person" liability in Section 20(a) of the Exchange Act.  Marbury Mgmt., Inc. v. Kohn, 629 F.2d 705, 712 (2d Cir. 1980) (citing SEC v. Management Dynamics, Inc., 515 F.2d 801, 812-13 (2d Cir. 1975)).  An employer is liable under respondeat superior if the employee, in committing the act complained of, was acting within the scope of her employment.  See Restatement (Third) of Agency § 2.04. Plaintiffs invoke respondeat superior (CAC ¶ 300), and elsewhere in the complaint allege nonconclusory facts plausibly establishing that Liu acted within the scope of her employment when making the allegedly false statements in the U.S. filings.  Accordingly, plaintiffs sufficiently allege that SPU is vicariously liable for CFO Liu's alleged violation of Section 10(b).

      C.     Plaintiffs Adequately Plead Loss Causation.

Loss causation "is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff."  Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 172 (2d Cir. 2005) (quoting Emergent Capital Inv. Mgmt, LLC v. Stonepath Group,

Inc., 343 F.3d 189, 197 (2d Cir. 2003)).[12]  "[T]o establish loss causation, 'a plaintiff must allege . . . that the subject of the fraudulent statement or omission was the cause of the actual loss suffered,' i.e., that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security."  Id. at 173 (quoting Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 95 (2d Cir. 2001) (emphasis added)). A plaintiff must "plead facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events."  First Nationwide Bank v. Gelt Funding Grp., 27 F.3d 763, 772 (2d Cir. 1994).  However, where a complaint pleads sufficient facts, the question whether the loss was actually caused by an intervening event, "like a general fall in the price of internet stocks," and not by revelation of the misstatements "is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss."  Emergent Capital, 343 F.3d at 197.

Plaintiffs adequately plead loss causation based on the Absaroka Report's revelation of apparent discrepancies between SPU's 2009 SEC and SAIC filings.  As discussed, plaintiffs allege that the Absaroka Report revealed that SPU's 2009 Form 10-K stated, among other things, revenue and income far higher than the revenue and income stated in the combined 2009 SAIC filings of SPU's Chinese subsidiaries.  (CAC ¶¶ 148-49.)  The Absaroka Report was released on June 1, 2011.  (Id. at 306.)  That day, SPU's stock declined from $2.55 to $2.08 per share, or 18%, on "unusually heavy" trading volume.  (Id.)  On these facts, it is sufficiently alleged that the "misstatement[s] . . . concealed something from the market that, when disclosed, negatively affected the value of the security."  Lentell, 396 F.3d at 173.  See also In re Sec. Capital Assurance, Ltd. Sec. Litig., 729 F. Supp. 2d 569, 599 (S.D.N.Y. 2010) ("Where courts

---

[12] The PSLRA provides that "[i]n any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages.'"  15 U.S.C. § 78u-4(b)(4).

have held that materializations of risks other than public disclosures resulted in shareholders' losses, those materializations were sudden and caused the stock value to plummet abruptly.")

2.      Plaintiffs Fail to Sufficiently Allege a Section 10(b) Claim Based on the Financial Statements for FY 2008.

Plaintiffs allege that SPU and the Officer Defendants violated Section 10(b) by knowingly or recklessly making false statements regarding SPU's 2008 performance in SPU's "2008 financial statements."  (CAC ¶ 172.)   The substance of plaintiff's allegation appears to be that (1) in 2008, SPU's only subsidiaries were SkyPeople China, Qiyiwangguo, and Huludao; (2) based on SPU's 2009 Form 10-K statement of 2008 revenue attributable to the only products Huludao produced—apple juice and apple aroma—Huludao could only have produced 16.5%, or $6.872 million, of SPU's in revenue in 2008; (3) adding $6.872 million to the revenue reported to the SAIC for SPU's other 2008 subsidiaries amounts to only $17.4 million; (4) but SPU's "2008 financial statements" show total revenue at 139% of this sum.  (CAC ¶¶ 165-172.)

Because they do not offer support for any of these propositions, plaintiffs fail to plead falsity with particularity.  First, plaintiffs do not point to, and the Court cannot locate, any section of the 2009 Form 10-K that attributes 16.5% of SPU's revenue to apple juice and apple aroma. Second, plaintiffs do not specify which "2008 financial statements" contain any statement of revenue that can be calculated as 139% of $17.4 million.  Third, and most importantly, plaintiffs do not explain whence they derive their allegations about what SkyPeople's Chinese subsidiaries reported to the SAIC regarding 2008.  Plaintiffs nowhere allege that they have seen any 2008 SAIC filings.  They allege only that they have seen 2009 filings for SkyPeople China and Qiyiwangguo.  (Id. ¶¶ 154, 157.)  The alleged Qiyiwangguo filings attached to the amended complaint do contain a statement of 2008 revenue (id. Ex. 5), but the alleged SkyPeople China filings do not (id. Ex. 4).  According to SPU, SkyPeople China did not exist in 2008.  (2008

Form 10-K at 2.)  Plaintiffs do not "plead with particularity sufficient facts to support [their] beliefs."  Novak, 216 F.3d at 313 (emphasis removed).

>  3.  Plaintiffs Fail to Sufficiently Allege a 10(b) Claim
>  Based on the Yingkou Transaction.

Plaintiffs allege that SPU and the Officer Defendants violated Section 10(b) of the Exchange Act by knowingly or recklessly omitting from its U.S. filings that the Yingkou transaction was a related-party transaction.  SEC Regulation S-K requires registrants to "[d]escribe any transaction, since the beginning of the registrant's last fiscal year, or any currently proposed transaction, in which the registrant was or is to be a participant and the amount involved exceeds $120,000, and in which any related person had or will have a direct or indirect material interest."  17 C.F.R. § 229.404(a).  A "related person" includes "any director or executive officer of the registrant."  Id.  Similarly, GAAP Statement of Financial Accounting Standards ("FAS") No. 57 provides that a public company's "[f]inancial statements shall include disclosures of material related-party transactions."  Fin. Accounting Standards Bd., FAS No. 57: Related Party Disclosures (Mar. 1982) ¶ 2.  FAS No. 57 defines "related party transactions" to include those between "an enterprise and its principal owners, management, or members of their immediate families," as well as those between a company and its "affiliates."  Id. ¶ 1.  FAS No. 57 defines "affiliate" to mean "a party that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with an enterprise."  Id. ¶ 24.a.

"[A]llegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim.  Only where such allegations are coupled with evidence of corresponding fraudulent intent, might they be sufficient."  Novak, 216 F.3d at 309 (quotations and citations omitted).   That is to say, even assuming that GAAP violations and

other accounting irregularities must be presumed to be misleading and inaccurate, see 17 C.F.R.

§ 210.4-01(a)(1), plaintiffs must still plead with particularity sufficient facts to raise an inference

of scienter "cogent and at least as compelling as any opposing inference one could draw from the

facts alleged," Tellabs, 551 U.S. at 324.

        In this case, plaintiffs' various theories regarding the Yingkou transaction either

fail to plead a false or misleading statement with sufficient particularity or fail to raise a

sufficiently strong inference of scienter.   To begin with, plaintiffs do not plead with particularity

sufficient facts to support the belief that CEO Xue and/or VP Yan secretly controlled Boai at all

times.  Plaintiffs admit that Boai "was registered by other parties."  (CAC ¶ 129.)  Nevertheless,

plaintiffs allege that "Boai was, at all times, a mere straw-man used by Yan and Xue to launder

assets onto [SPU's] balance sheet," based solely on the allegations that (1) Boai bought Yingkou

from Hede shortly before it agreed to sell Yingkou to SPU and that  (2) CEO Xue picked up

Boai's business license from the state authority.  (Id. ¶¶ 28, 127-29.)  Plaintiffs do not allege that

Xue or Yan had an overt interest in Boai either when it bought Yingkou from Hede or when it

sold Yingkou to SPU.  Plaintiffs do not allege that only the owner of a business can pick up the

business's license.  Plaintiffs do not explain why events surrounding the founding of Boai in

2005 have any relevance to its ownership in 2008 or 2009.  Finally, and most troublingly,

plaintiffs make no attempt to explain why Xue would acquire an overt ownership interest in Boai

if he already secretly controlled Boai—and used his secret control to "launder assets."  On these

facts, it is neither sufficiently, nor even plausibly, alleged that CEO Xue or VP Yan secretly

controlled Boai at any relevant time.

        Putting aside the secret-control theory, plaintiffs' own allegations reveal that the

Yingkou transaction was not a related-party transaction when approved by SkyPeople China's

shareholders or when completed.  Plaintiffs allege that SkyPeople China's shareholders approved the purchase of Yingkou from Boai on May 26, 2008, and that SPU eventually purchased Yingkou on November 29, 2009.  (CAC ¶¶ 119-121).  Plaintiffs further allege that CEO Xue and VP Yan owned a 46% interest in Yingkou from January 6 to November 10, 2009.  (CAC ¶ 21.)  Thus, as defendants stated in their 2010 Form 10-K, quoted by plaintiffs, "there was no affiliation between the relevant directors and officers of [SPU] and the seller of Yingkou at the time [the] Yingkou Acquisition was initially approved . . . and the affiliation between the relevant directors and officers and the seller of Yingkou came into existence while the transaction was being delayed and such affiliation ended prior to the consummation of the acquisition."  (Id. ¶ 131.)

Although the Yingkou transaction may have become a related-party transaction during the time that Xue and Yan held their ownership interest, plaintiffs fail to sufficiently allege that defendants' failure to report this transient ownership was the product of an intent to deceive.  It is unclear whether the requirement that companies disclose "proposed" transactions in which "any related person . . . will have a direct or indirect material interest," 17 C.F.R. § 229.404(a), applies to a situation in which a company agrees to purchase a target, declines for an extended period to do so, and corporate officers then take an interest in the target—especially when no support is offered for the inference that the officers intended to maintain their ownership interest through any eventual acquisition.  (The fact that Xue and Yan divested themselves of their interest prior to the acquisition tends to rebut that inference.)  However, defendants themselves concluded that the Yinkgou transaction should have been disclosed according to their own policies and "the related SEC rules."  (CAC ¶ 132); 2010 Form 10-K at 48.  Arguably, this is enough—even under the applicable heightened pleading standards—to

establish that the Yinkgou transaction was a related-party transaction and, therefore, that not

disclosing it was misleading.  However, given the tenuousness of the argument that disclosure

was required, and given that the defendants themselves admitted their mistake—accepting the

attendant risk of litigation—there is no strong inference of scienter.  On these facts, the

disclosure failure was more likely an oversight than an attempt to deceive.

   The same reasoning disposes of plaintiffs' allegation, made for the first time in

their opposition papers, that the Yingkou transaction was a related-party transaction in February

2008.  Plaintiffs allege that SPU initially agreed to buy Yingkou on February 25, 2008, when it

was owned by Hede, a company that is wholly owned by Xue and Yan.  (See Pl. Mem. 5.)  In

support of this allegation, plaintiffs cite to a portion of SPU's Amended Form 10-K for 2009,

which states:

> [T]he acquisition of Yingkou was originally contemplated in connection with the
> Company's private financing in 2008 pursuant to the Series B Convertible
> Preferred Stock Purchase Agreement, dated February 25, 2008, by and between
> the Company and certain accredited investors, or the Series B Purchase
> Agreement. The Series B Purchase Agreement required that, when it became
> legally and financially feasible, the Company make arrangements, including
> acquisition arrangements, with Yingkou so that after giving effect to such
> arrangements, the financials of Yingkou would be consolidated into the
> Company's financials in accordance with the principles of the generally accepted
> accounting principles of the US GAAP.

SkyPeople Fruit Juice, Inc., SEC Form 10-K/A for Year Ended Dec. 31, 2009 (the "Amended

2009 Form 10-K") at 5.[13]   It is at best debatable whether the company's commitment to

purchase Yinkgou "when it became legally and financially feasible" created a "proposed"

transaction in which a related-party "will have a direct or indirect material interest."  Notably,

the shareholders of SkyPeople China did not agree to a purchase of Yingkou until May 25,

---

[13] Available at http://sec.gov/Archives/edgar/data/1066923/000141588911000227/sp10ka-dec312009.htm.

2008,[14] at which point Yingkou was owned by Boai.  (Id. at 6.)  Even assuming these facts establish a related-party transaction that SPU failed to disclose in its 2008 filings, there is no sufficiently strong inference of scienter.  The argument that the alleged facts created a related-party transaction is again dubious, and SPU again made full disclosure.  The inference that SPU intended to deceive stockholders is not as strong as the inference that SPU overlooked that the Series B Purchase Agreement created a related-party transaction, if it indeed did so.

Similarly, plaintiffs fail to allege with particularity that defendants committed fraud by announcing an intention to disclose transactions like the Yingkou transaction and then failing initially to disclose it.  Plaintiffs are correct that when defendants knowingly or recklessly fail to follow policies announced in their public filings, they may "cause[] those filings to be materially misleading in that the disclosed policy no longer reflect[s] actual practice."  Novak, 216 F.3d at 311 (defendants allegedly "knowingly sanctioned" procedure violating announced polices); Rothman, 220 F.3d at 91 (defendants allegedly recklessly failed to follow announced procedures).  In the cases relied upon by plaintiffs, the alleged violation of the announced policy was either repeated or constant, i.e., the policy was never followed during the class period.  See Novak, 216 F.3d at 311 (defendants allegedly maintained "Box and Hold" inventory "scheme," avoiding markdowns on obsolete inventory, contrary to stated markdown policy); In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 77 (2d Cir. 2001) (defendants allegedly failed to employ stated accounting policy despite 5-month opportunity and several triggering events).[15]

---

[14] The Amended 2009 Form 10-K puts the date of the shareholder vote at May 25, 2008, see Amended 2009 Form 10-K at 6; plaintiffs' amended complaint gives the date as May 26, 2008 (CAC ¶ 121).

[15] See also In re Sadia, S.A. Sec. Litig., 643 F. Supp. 2d 521, 528-32 (S.D.N.Y. 2009) (defendants allegedly used currency hedging practice to speculate on currency rather than to mitigate risk on foreign-denominated future sales contracts); Owens v. Gaffken & Barringer Fund, LLC, No. 08 Civ. 8414, 2009 WL 3073338, *7 (S.D.N.Y. Sept. 21, 2009) (defendants allegedly invested client's money entirely in illiquid, volatile instruments, despite promises of liquidity and  low-risk returns).  But cf. SEC v. Todd, 642 F.3d 1207, 1217 (9th Cir. 2011) (holding that substantial

The repeated or constant nature of the violations supported the inferences that the announced policy never reflected or "no longer reflected actual practice," Novak, 216 F.3d at 311, and that the defendants acted with scienter, see Scholastic, 252 F.3d at 77.  Plaintiffs in this case neither plead falsity with particularity nor raise a strong inference of scienter by alleging that defendants violated their announced policy on a single occasion and thereafter discovered and disclosed the violation.  To the contrary, the facts alleged tend to show that plaintiffs adhered to, or at least endeavored to adhere to, the announced policy.

Finally, plaintiffs are wrong that the language of a 2002 SEC Release required SPU to discuss the Yingkou transaction as "non-arm's length transaction" in the "Management's Discussion & Analysis" section of its annual filings.  Plaintiffs point to In Re Comm'n Statement, Release No. 8056, FR-61, 2002 WL 77153, *9 (January 22, 2002).  Release No. 8056 stated that "registrants should also consider the need for disclosure about parties that fall outside the definition of 'related parties,' but with whom the registrant or its related parties have a relationship that enables the parties to negotiate terms of material transactions that may not be available from other, more clearly independent, parties on an arm's-length basis."  Id.  While SEC Releases are entitled to deference, S.E.C. v. Cavanagh, 445 F.3d 105, 114 n.23 (2d Cir. 2006), the guidance in this release does not help plaintiffs establish a violation of Regulation S-K.  To begin with, plaintiffs do not explain how defendants failed to comply with Release No. 8056 by not disclosing something the release allegedly asked SPU only to "consider" disclosing.  More importantly, the guidance is not relevant.  There is no dispute that Xue and Yan were at all times related parties to SPU; the dispute is whether they had a material interest in the Yingkou

---

evidence supported jury's finding of material misrepresentation in company's reporting of fixed-asset sale as revenue, based on evidence including (1) expert testimony that reporting the sale as revenue violated GAAP, (2) employee testimony that reporting the sale as revenue was improper, and (3) public filings stating contrary accounting policy.)

transaction.  Plaintiffs appear to confuse the release's guidance on related parties for guidance on what makes parties related to—which is to say, materially interested in—a transaction.

Ultimately, the only theories advanced by plaintiffs that may establish a false statement with the requisite particularity are the theories that the Yingkou transaction became a related-party transaction during Xue and Yan's temporary indirect ownership or that it was a related-party transaction when conceived as part of the Series B Purchase Agreement.  However, as to these theories, plaintiffs fail to sufficiently allege scienter.  The Court remains mindful that the scienter inquiry must be made with reference to all of the facts alleged, not by taking individual allegations in isolation.  Telllabs, 551 U.S. at 322-23.  However, even when all of plaintiffs' allegations are taken as a whole, they do not give rise to an inference of scienter as least as "cogent and compelling" as nonculpable explanations, id. at 324.  Essentially, plaintiffs ask the Court to infer that, because certain defendants had ownership interests in Yingkou before and after the formal agreement to purchase Yingkou, but not at the time the transaction was completed, there must have been a secret mechanism by which those defendants profited from the transaction—through "money laundering."  This speculation does not approach the cogency of the alternative explanation, to wit, that the defendants tried to comply with the law on related-party transactions as they reasonably understood it.  Therefore, plaintiffs fail to state a Section 10(b) claim based on the non-reporting of the Yingkou transaction.

          b.      Section 20(a)

Plaintiffs allege that the all of individual defendants except H. Xue are separately liable as control persons under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t.  Section 20(a) provides that "every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such

controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." Id. "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 108 (2d Cir. 2007).

As regards the moving defendants, plaintiffs have sufficiently alleged only that the CFO Liu violated Section 20(a). Plaintiffs have sufficiently alleged a primary violation based on false statements of SPU's 2009 performance and structure, and plaintiffs have also sufficiently alleged that the Liu herself violated Section 10(b) by making the allegedly false financial statements for 2009. A fortiori, plaintiffs sufficiently allege that the Liu controlled and culpably participated in the making of those allegedly false financial statements. However, because plaintiffs fail to establish a primary violation based on either the Yingkou transaction or on the alleged falsity of SPU's 2008 financial figures, plaintiffs fail to establish violations of Section 20(a) based on those allegations. Although plaintiffs allege that the Director Defendants violated Section 20(a), the amended complaint makes this allegation based only on the Director Defendants' alleged participation in the non-reporting of the Yingkou transaction. (See Am. Compl. ¶ 331.b.) No other ground is expressed, and plaintiffs do not argue otherwise in their opposition papers. Because plaintiffs fail to sufficiently plead a primary violation based on the Yingkou transaction, plaintiffs also fail to sufficiently plead that the Director Defendants violated Section 20(a) based on that transaction.

## CONCLUSION

For the foregoing reasons and to the extent set forth above, the motion to dismiss of SPU, Liu, Ko, Fields, and Smagula (ECF No. 49) is GRANTED in part and DENIED in part. Rodman's motion to dismiss any claims asserted against it by Lewy, Lee, and Klement (ECF No. 52) is GRANTED.

SO ORDERED.

_____
P. Kevin Castel
United States District Judge

Dated: New York, New York
September 7, 2012

40